# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

RALPH M. MARCUM, et al.,       )
                                  )
                                  )
          **Plaintiffs,**     )
                                  )     **Civil Action No. 09-1912 (RCL)**
    **v.**                   )
                                  )
**KEN SALAZAR, SECRETARY,**   )
**United States Secretary of the Interior,**  )
**et al.,**                      )
                                  )
                                  )
          **Defendants.**    )
_____)

## MEMORANDUM OPINION

Plaintiffs paid a princely sum for the opportunity to shoot African elephants in Zambia and then they wanted to import the animals' corpses back to the United States. The trouble is that plaintiffs' attempts at post-mortem importation run up against some complex law. The United States is a signatory to the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), a multilateral treaty that protects wildlife vulnerable to trade, including African elephants. 27 U.S.T. 1087; T.I.A.S. 8249, Mar. 3, 1973. It implements CITES through the Endangered Species Act ("ESA")—"the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. V. Hill*, 437 U.S. 153, 180 (1978). Both prioritize plaintiffs' prey as a protected species, entangling it in the sprawling machinations of international environmental law. Plaintiffs' desire to keep these corporal mementos from their African adventures doesn't trump the law, which the agency

1

applied rationally in this case. Therefore, the Court will deny their motion for summary

judgment and grant the agency's cross-motion for summary judgment for the reasons that follow.

## I. Legal Background

### A.    CITES

CITES divides the species it governs into three appendices. 27 U.S.T. 1087; T.I.A.S.

8249, Mar. 3, 1973. It lists the African elephant in its first and most restrictive Appendix, which

allows trade only in exceptional circumstances. *Id.* art. II; *see also id.* ("Trade in specimens of

[Appendix I] species must be subject to particularly strict regulation in order not to endanger

further their survival.").

Before issuing a CITES export permit for an Appendix I species, the designated

governmental "Scientific Authority" in the exporting country must find that the export won't be

"detrimental to the survival of the species involved." *Id.* art. III(2). The Scientific Authority of

the importing country must make an independent determination that "the import will be for

purposes which are not detrimental to the survival of the species involved." *Id.* art. III(3).

The CITES signatory countries, called parties, have resolved that "the Scientific

Authority of the importing country" should "accept the finding of the Scientific Authority of the

exporting country that the exportation of the hunting trophy is not detrimental to the survival of

the species" under CITES Article III paragraph 2(a). CITES Res. Conf. 2.11(b). But it doesn't

need to do so where "there are scientific or management data to indicate otherwise." *Id.*

Moreover, "the scientific examination by the importing country in accordance with paragraph 3

(a) of Article III"—namely, that "the import will be for purposes which are not detrimental to the

survival of the species involved"—must "be carried out independently of the result of the scientific assessment by the exporting country in accordance with paragraph 2 (a) of Article III, and vice versa." CITES Res. Conf. 2.11(c).

### B.     The ESA

The United States implements CITES through the ESA, which embodies Congress's commitment "to halt and reverse the trend towards species extinction, whatever the cost." *Hill*, 437 U.S. at 184. As part of that commitment, Congress has prohibited "trade in any specimens contrary to the provisions of [CITES]." 16 U.S.C. § 1538(c)(1). It has charged the Department of the Interior ("DOI") with enforcing the ESA, 16 U.S.C. § 1540(e)(1), and has authorized DOI to promulgate regulations necessary to enforce the ESA and CITES. *Id.* §§ 1537(a), 1540(f). DOI delegated certain implementation functions to the Fish & Wildlife Service ("FWS"), including functioning as the CITES Management Authority and Scientific Authority for the United States. *Id.* § 1537a.

Federal regulations and CITES require both a valid import permit issued by FWS and a valid export permit issued by the exporting country before any Appendix I animal—like an African elephant—may be transported into the United States. 50 C.F.R. § 23.20; CITES art. III. To grant a CITES import permit application for an Appendix I species, FWS must first determine that "a proposed import of an Appendix I specimen is for purposes that would not be detrimental to the survival of the species." *Id.* § 23.61(a). To determine whether an activity is "detrimental," FWS considers whether the use is "unsustainable," "would pose a net harm to the status of the species in the wild," would cause "interference with recovery efforts for a species," or would

3

result in "stimulation of further trade." *Id.* § 23.61(b), (e). The permit applicant bears the burden of providing sufficient information to support a non-detriment finding. *Id.* § 23.61(c).

In making a non-detriment finding for an Appendix I species, FWS also considers whether the removal of the animal from the wild "is part of biologically based sustainable-use management plan that is designed to eliminate over-utilization of the species," "would not contribute to the over-utilization of the species, considering both domestic and international uses," "would pose no net harm to the status of the species in the wild," and "would not lead to long-term declines that would place the viability of the affected population in question." *Id.* To make this determination, FWS uses "the best available biological information," including "trade information . . . and other scientific management information." *Id.* § 23.61(f). In cases where insufficient information is available or the factors of Section 23.61 aren't satisfactorily addressed, FWS won't make a non-detriment finding, and a permit won't issue. *See id.* § 23.61(f)(4). FWS may also deny a permit application if it finds that the exporting country's non-detriment finding isn't supported by the data:

> [c]onsistent with revised Conf. 2.11(c), the U.S. Scientific Authority will accept a "not-detrimental" finding of the exporting country for that year, unless there are scientific or management data to indicate otherwise. If the scientific or management data indicate a concern about the reasonableness of an exporting country's "not detrimental" finding, the Service will consult with that country's Scientific and Management Authorities.

Withdrawal of Proposed Guidelines on African Elephant Sport-Hunted Trophy Permits, 60 Fed. Reg. 12,969, 12,971 (emphasis added) (Mar. 9, 1995).

An application to import sport-hunted African elephant trophies is also subject to additional regulatory requirements beyond the non-detriment finding required by 50 C.F.R. §

17.40(e)(3). Of relevance here, such trophies may be imported only if "[a] determination is made that the killing of the animal whose trophy is intended for import would enhance the survival of the species." *Id.* § 17.40(e)(3)(iii)(C). This requirement derives from the ESA, which provides that FWS "may permit . . . any act otherwise prohibited by section 1538 of this title . . . to enhance the propagation of the affected species." 16 U.S.C. § 1539(a)(1)(A). Section 1538 makes it unlawful to "violate any regulation pertaining to . . . any threatened species of fish or wildlife listed pursuant to section 1533 of this title." 16 U.S.C. § 1538(a)(1)(G). Federal regulations extend the other protections of section 1538, including prohibitions on import, possession, and lethal or non-lethal "take," to "threatened" as well as "endangered" animals. 50 C.F.R. § 17.31(a).

### C. The African Elephant

Elephant populations in Zambia began declining rapidly in the 1970s due in part to hunting for ivory. Administrative Record ("AR") at 718. Biologists estimated that by 1989, Zambia's elephant population had fallen below 18,000 from an estimated 200,000 in the 1970s. *Id.* Current estimates show no significant population increase since 1989. AR 710.

In 2002, at the 12th CITES Convention of the Parties, Zambia applied to have its elephant population downlisted from Appendix I of CITES to the less protective Appendix II, in order to facilitate sport hunting by foreign travelers and permit the sale of stockpiled ivory. AR 79. As CITES required, the CITES Secretariat convened an independent panel of scientists ("CITES Panel") to consider the application and make a recommendation as to whether it should pass. *See* CITES Res. Conf. 10.9; AR 79–93 (Panel report). Specifically, the CITES Secretariat tasked the

Panel with assessing Zambia's elephant population, potential risks to the species, and Zambia's ability to monitor the population and implement anti-poaching measures. AR 79.

After a five-day visit in Zambia, the CITES Panel issued a "negative determination." AR 92. Among other problems, the Panel found that:

- The Zambian wildlife agency ("ZAWA") was plagued with "much political interference." AR 82.

- "[F]or a period of almost 10 months in 2000, there was virtually no law enforcement in the majority of Zambia's conservation areas. The result was that illegal hunters killed relatively large numbers of elephants. To illustrate this, during the above 10-month transition period, it was estimated that 156 elephants were killed in an area about 2,560 [square] km in the central Kafue alone." *Id.*

- "[M]ost conservation areas in the Kafue Region were losing wildlife at an unsustainable rate" due to a "wave of illegal activity." AR 83.

- "[T]he fact that the overall population is not increasing (and could be decreasing) suggests that there is an important illegal offtake that accounts for a substantial amount of the ivory that could in theory be produced from an elephant population of this size. The Panel estimates that this accounts for up to some 800 animals a year. In view of these factors, it must be concluded that the overall level of offtake is not sustainable." AR 84.

- "Since . . . 1998, Zambia's own capability to monitor its elephant population has been virtually non-existent." *Id.*

- "The current situation suggests that there has been a drastic decline in the effectiveness of the antipoaching activities. This appears to be mainly the result of a severe depletion of operational funding. . . . The insufficient and erratic supply of operational funds and logistical support has greatly affected the performance of staff. The consequence of these actions has been a substantial increase in the level of poaching of all species." AR 85.

- With respect to ivory seized from poachers, Zambia's ivory stockpile was "susceptible to fraud" due to improper storage, inadequate organization, and many tusks unaccounted for. AR 86.

- Several ZAWA staff members had been arrested for illegal elephant trade. AR 88.

In light of these findings, the Parties to CITES voted to reject Zambia's downlisting proposal at the 12th Convention of the Parties. AR 120.

## D. Factual Background

In 2005 and 2006, plaintiffs Ralph Marcum, Walt Maximuck, Earl Slusser, and Dean Mori each killed at least one elephant in Zambia for sport and then applied to FWS for an import permit to import the trophy into the United States. Am. Compl. ¶¶ 7–11, 52–58 (Doc. 20); *see also* AR 337–45, 370–83, 386–409, 432–47. To import their trophies, plaintiffs needed a CITES export permit from Zambia and a CITES import permit from FWS. Before issuing an import permit for sport-hunted elephants, FWS must find, among other things, that: (1) the import "is for purposes that would not be detrimental to the survival of the species, 50 C.F.R. § 23.61(a), and (2) "the killing of the animal whose trophy is intended for import would enhance survival of the species." 50 C.F.R. § 17.40(e)(3)(iii)(C).

FWS's Division of Scientific Authority ("DSA," the designated CITES "Scientific Authority" for the United States) makes the regulatory "non-detriment" finding and sends it to FWS's Division of Management Authority ("DMA," the designated CITES "Management Authority" for the United States). This DSA finding is referred to as an "Advice." DMA considers the DSA "non-detriment" finding and its own assessment as to whether the import would "enhance the survival of the species" in deciding whether or not to issue permits. On May 11, 2005, DSA sent DMA its "General Advice" on sport-hunted elephants in Zambia for calendar year 2005. AR 317–20. After considering plaintiffs' applications as well as materials submitted by ZAWA, AR 125–38, 186–280, DSA found several obstacles to making a non-detriment finding:

- Evidence that "areas other than the specified game management units will be used for sport hunting of elephants." AR 317.

- Inconsistencies in reported elephant population estimates. AR 318.

7

- Failure to comply with CITES obligations under the "Monitoring of Illegal Killing of Elephants" program. *Id.*

- The absence of government funding for elephant management and protection. *Id.*

- The lack of a ratified government management plan that "carries the weight of law" and outlines specific information about how it will actually be implemented. AR 319.

- No reliable poaching data. *Id.*

- The absence of any "effective" "anti-poaching measures." *Id.*

DSA also relied on the findings of the 2002 CITES Panel, AR 79–93 (CITES Panel report); AR 319 (DSA citing CITES Panel), and found no evidence that the situation in Zambia had materially improved since the CITES Panel issued its findings about ZAWA's to control poaching. AR 319; *see also* AR 287 (FWS official opining that ZAWA's quota proposal "is unsupportable in its current form and should be returned to ZAWA for considerable revision and clarification"); AR 284–87 (outlining twenty-six specific problems with ZAWA's submissions). In light of these findings, DSA concluded that it was unable to make the non-detriment finding required to permit import of sport-hunted elephant trophies. AR 317.

Just over a week later, FWS informed ZAWA that it would be unable to issue import permits for sport-hunted elephants on the basis of the information ZAWA provided to date, and requested additional information to address these concerns. AR 327–31. In June 2005, ZAWA sent FWS more information about Zambian elephants. AR 345–63. Although FWS "did receive [this] additional information from Zambia, [ ] it was insufficient for [FWS] to change our minds on the possibility of issuing import permits for elephants." AR 472. FWS gave ZAWA a third chance to address the outstanding concerns. AR 494–97 (requesting more information on nineteen unresolved issues).

By March 2008, although ZAWA had sent a responsive report, FWS still hadn't received the information necessary to support the required non-detriment and enhancement findings. AR 640–41. It gave ZAWA a fourth opportunity to provide the necessary information. *Id.* In September 2008, ZAWA responded with three additional pages. AR 676–78. The following year, at the biannual Conference of the Parties to CITES, Zambia again petitioned to downlist its elephant population to Appendix II, AR 678–704, which was again voted down by the Parties. FWS asked ZAWA a fifth time for further information to support a non-detriment finding on May 27, 2009. AR 685. Having received no further response, FWS proceeded to process plaintiffs' permit applications.

On November 5, 2009, DMA requested that DSA make a non-detriment finding on plaintiffs' applications. AR 686. On March 10, 2010, DSA issued its General Advice on Zambian sport-hunted elephants during 2006. AR 708–716. In so doing, DSA looked at the issues it had identified in its earlier General Advice for 2005, AR 317–20, to see whether new information Zambia had submitted had ameliorated its concerns. Although Zambia had addressed a few of the concerns, DSA was still unable to make a non-detriment finding under 50 C.F.R. § 23.61 because: (1) there was still no indication from the Zambian government of a reliable funding stream to support elephant management and protection measures; (2) the draft proposed Zambian management plan had still not been ratified or given the force of law; (3) no reliable data had yet been presented regarding the level of poaching; (4) Zambia still lacked measurably effective anti-poaching measures; and (5) Zambia's law enforcement reporting system was still plagued with discrepancies and data problems. AR 711–15.

In addition to DSA's decision not to issue a non-detriment finding, DMA also concluded that plaintiffs' proposed import wouldn't enhance the survival of the species, as 50 C.F.R. § 17.40(e)(3)(iii)(C) required. Specifically, DMA found that although "sport-hunting could have a positive effect on the conservation of elephants when a sound management plan is in place," Zambia had no such management plan. Although ZAWA reported $298,000 in income from elephant sport-hunting permits between 2005 and 2007,

> there was no indication given as to how this revenue was utilized to further elephant conservation and management programs within Zambia. This puts into question whether the revenue ZAWA collected from elephant sport-hunting during this timeframe in any way furthered Zambia's efforts to establish a sustainable management program for elephants.

AR 720; *see also* AR 1188–1200. Since plaintiffs' permit applications met neither the non-detriment requirement in 50 C.F.R. § 23.61, nor the enhancement standard in 50 C.F.R. § 17.40(e)(3)(iii)(C), FWS denied them on March 10, 2010. AR 717–36.

On April 14, 2010, plaintiffs filed administrative requests for reconsideration, AR 952–1175, which were based primarily "on information that was made available at the Fifteenth Meeting of the Conference of the Parties to CITES (CoP15) held in Doha, Qatar, in March of 2010, on the current status and management of Zambia's elephant populations." AR 1177. After reviewing this additional information, FWS "determined that these documents are not relevant to the status of elephant populations in Zambia at the time you would have conducted your hunt, or to how elephants were being managed by ZAWA at that time." AR 1178; *see also id.* (noting that "there is nothing to indicate that the policy and plan had actually been ratified or were being implemented at the time you took your trophy"). Accordingly, "DMA is still unable to find that the import of your hunted elephant taking in [2005 or] 2006 would enhance the survival of the

species in the wild." *Id.* DSA also reviewed the request for reconsideration with respect to the non-detriment finding and found no justification for reversing its original decision. *Id.* Accordingly, FWS denied plaintiffs' requests for reconsideration. *Id.*; *see also* AR 1179–84 (denying other plaintiffs as well).

## II. Standard of Review

### A.      Summary Judgment

### II. Legal Standard

Courts will render summary judgment if the pleadings, the discovery, and disclosure materials on file, and any affidavits "show [ ] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). It is settled that "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiffs—the parties bringing the claims in this case—bear the burden of proof and persuasion. *Id.* Once defendants have identified those claims on which they believe they are entitled to summary judgment, plaintiffs must present evidence that demonstrates that the facts and law entitle them to relief on their claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).

### B.      The APA

Courts review agency decisions under the ESA according to the Administrative Procedure Act ("APA"). *American Wildlands v. Norton*, 193 F. Supp. 2d 244, 251 (D.D.C. 2002) (citing *City of Las Vegas v. Lujan*, 891 F.2d 927, 932 (D.C. Cir. 1989)). Under the APA, the reviewing court may set aside agency action found to be "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C). Judicial review is based on "the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." *Id.* § 706. There is no judicial review of agency action [ ] committed to agency discretion by law." *Id.* § 701(a)(2).

In evaluating agency decision making under the APA, the Court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens of Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977). The scope of review "under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983). Administrative actions are presumed valid; thus, a "court will not second guess an agency decision or question whether the decision made was the best one." *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1565 (D.C. Cir. 1991). The APA only requires the Court to decide whether the agency "articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983) (citations omitted).

Where, as here, an agency's technical expertise is involved, the reviewing court should be particularly zealous in guarding the agency's discretion. *March v. Oregon Natural Res. Council*, 490 U.S. 360, 376–77 (1989); *see also Baltimore Gas*, 462 U.S. at 103 (holding that "[w]hen examining . . . [a] scientific determination . . . a reviewing court must generally be at its most deferential."). The court "must look at the decision not as the chemist, biologist or statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising

[its] narrowly defined duty of holding agencies to certain minimal standards of rationality." *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc).

Because actions reviewed under the APA's standard of review are governed by the administrative record, there are no facts for the Court to resolve. *Hospital of Univ. of Pa. v. Sebelius*, 634 F. Supp. 2d 9, 12–13 (D.D.C. 2009). Judicial review of plaintiffs' claims is limited to the administrative record, and the Court should determine agency compliance with the law solely on the record on which the decision at issue was made. 5 U.S.C. § 706. Summary judgment "thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sebelius*, 634 F. Supp. 2d at 13.

The fact that this case comes before the Court on the parties' cross-motions for summary judgment doesn't relieve plaintiffs of their burdens of proof and persuasion. Agency action is entitled to a presumption of regularity. *Overton Park*, 401 U.S. at 415. It is plaintiffs' burden to prove the particular manner in which defendants' actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also City of Olmsted Falls, Ohio v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002). If plaintiffs fail to meet their burden, their summary judgment motion must be denied and the Court must enter judgment for defendants.

### III.     Analysis

#### A.     The Court will grant defendants' cross-motion for summary judgment on Claims One and Three because those claims are moot.

In Claim One of their Amended Complaint, plaintiffs raise various allegations regarding FWS's "failure to process" their import permits. Am. Compl. ¶¶ 59–66; *see also* Mem. In Supp. of Pls.' Mot. Summ. J. ("Pls.' Mem.") at 37–40 (Doc. 35). But on March 10, 2010—before plaintiffs filed their Amended Complaint—FWS had finished processing their applications. AR 717–36 (denying plaintiffs' applications). Because plaintiffs have already received the specific relief requested in Claim One, it is now moot.

Article III of the United States Constitution establishes federal courts of limited jurisdiction. As a result, for better or worse, a great many legal actions can't be resolved in the federal courts because they don't meet the Constitution's basic jurisdictional requirements. Defendants' mootness objection in this case amounts to a claim that this Court lacks the power to decide this case because it falls outside of the court's limited jurisdiction as contemplated by Article III.

The most important limitation on federal court jurisdiction in Article III is the "case-or-controversy requirement," which the Supreme Court has described as the "irreducible constitutional minimum" of standing. *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). To satisfy this case-or-controversy requirement of standing, a plaintiff must, generally speaking, demonstrate that he has suffered an "injury in fact," that the injury is "fairly traceable" to the defendant's actions, and that a favorable decision will likely redress the injury. *Lujan*, 504 U.S. at 560–61. This serves to

prevent federal courts from issuing advisory opinions or decisions based on hypothetical facts or abstract issues. *Flast v. Cohen*, 392 U .S. 83, 96 (1968). "The doctrine of mootness is a logical corollary of the case or controversy requirement[.]" *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 90 (D.C. Cir. 1986). In cases where challenged conduct ceases and "there is no reasonable expectation that the wrong will be repeated, . . . it becomes impossible for the court to grant any effectual relief whatever to the prevailing party, and any opinion as to the legality of the challenged action would be advisory." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000). Accordingly, a court may not rule on the merits of a claim when it has become moot.

Courts must evaluate mootness "through all stages" of the litigation in order to ensure that a live controversy remains. *21st Century Telesis Joint Venture v. F.C.C.*, 318 F.3d 192, 198 (D.C. Cir. 2003) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000) and *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). As a result, "[e]ven where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Id.* (quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990)).

A case is moot when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *City of Erie*, 529 U.S. at 287 (internal quotations omitted). An intervening event may render a claim moot if (1) there is no reasonable expectation that the conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violations. *Pharmachemie B.V. v. Barr Labs ., Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002); *Sellers v. Bureau of Prisons*, 959 F.2d 307, 310 (D.C. Cir. 1992). The burden of establishing mootness rests on the party raising the issue, and it is a heavy burden. *County of*

*Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 458–59 (D.C. Cir. 1998).

Judge Bates applied these principles recently and dismissed a nearly identical claim, finding that where "the Service has processed plaintiffs' permit applications" to import sport-hunted Wood Bison trophies, "the parties are no longer legally adverse to one another, and there no longer exists any immediate, actual dispute that warrants declaratory relief." *Conservation Force v. Salazar*, 715 F. Supp. 2d 99, 105 (D.D.C. 2010). The same reasoning applies here. Plaintiffs' gripe in Claim One was that FWS hadn't processed their claim. Now that FWS has processed plaintiffs' permit applications, this Court can do nothing more for them. Accordingly, Claim One is moot, and this Court will enter judgment for defendants with regard to it.[1]

Claim Three is also moot because it is based on allegations that FWS's "failure to consider and process plaintiffs' enhancement permits" was unlawful, and demands that "defendants . . . be compelled to complete their review with all appropriate haste." Am. Compl. ¶¶ 74–78. As with Claim One, plaintiffs have already obtained the relief requested, rendering Claim Three moot. *Robinson*, 637 F. Supp. 2d at 16–17. The Court makes no statement about whether plaintiffs would have succeeded on their first or third claims had defendants not processed their permit applications before now. Federal courts have a term for judicial guess-

---

[1] In their Amended Complaint, plaintiffs added paragraph 66a to Claim One after FWS processed their permit applications. That paragraph attacks FWS's denials of their permit applications on their merits under the APA's "arbitrary and capricious" standard. Am. Compl. ¶ 66a. This new paragraph duplicates plaintiffs' Claim Four. *Id.* ¶¶ 79–84. To the extent that plaintiffs transplanted a piece of their fourth claim into their first to save the first from jaws of mootness, that transplantation fails. The Court will consider Paragraph 66a with the rest of Claim Four later in this Opinion. It would be overly formalistic and, more importantly, a huge waste of time for the Court to consider the merits of Claim Four twice simply because plaintiffs repeat their allegations in more than one claim in their Amended Complaint.

work on such "might-have-been" scenarios. They are called advisory opinions, and this Court may not issue them. Therefore, the Court will grant defendants summary judgment on plaintiffs' third claim as well.

### B.    The Court will grant defendants' cross-motion for summary judgment on Claims Two and Six.

This Court lacks jurisdiction to decide Claims Two and Six for at least two reasons. First, plaintiffs' complaints about wrongful permit denials can't be enforced via the ESA's citizen-suit provision—the sole basis plaintiffs invoke for these claims. Second, even if they could challenge the permit denials under the ESA's citizen-suit provision, these claims would fail because they failed to notify defendants prior to filing suit as the ESA requires.

The ESA's citizen-suit provision provides, in relevant part, that:

> Any person may commence a civil suit on his own behalf—(A) to enjoin any person, including the United States and any other governmental instrumentality . . . who is alleged to be in violation of any provision of this chapter . . .; or . . . (C) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary.

16 U.S.C. § 1540(g)(1). Plaintiffs aren't eligible for judicial review under subsection (C) because they allege no violations of section 1533. Instead, they rely on subsection (A). Am. Compl. ¶¶ 68, 93. The problem is that the Supreme Court has interpreted subsection (A) to allow a person to bring suit only to enforce substantive prohibitions of the ESA, not to attack the Service's implementation of the ESA. *Bennett v. Spear*, 520 U.S. 154, 173 (1997). Plaintiffs' second and sixth claims argue that the agency didn't adequately perform its duties under the ESA, which is precisely the sort of maladministration claim that the Supreme Court held wasn't appropriate under the ESA's citizen-suit provision.

In *Bennett*, the Supreme Court held that plaintiffs couldn't use the ESA's citizen-suit provision to attack the Secretary's maladministration of the ESA because allowing such suits would render large sections of the ESA superfluous. *Id.* at 173–74. The Court pointed out several other provisions of the ESA that were incompatible with allowing such suits. First, if § 1540(g)(1)(A) allowed suit against the Secretary for "*any* 'violation' of the ESA," then § 1540(g)(1)(C), which allows suit against the Secretary only to compel him to perform nondiscretionary duty under § 1533, would make no sense. *Id.* at 173 (emphasis in original). After all, what meaning could that limitation possibly have if the statute allowed suit against the Secretary for any reason just a few lines later?

The Court pointed out other incongruities that would arise if it adopted the broad interpretation of "violation" that plaintiffs press in this case. For instance, it noted that "the ESA uses the term 'violation' elsewhere in contexts in which it is most unlikely to refer to failure by the Secretary or other federal officers and employees to perform their duties in administering the ESA." *Id.* Section 1540(a) authorizes the Secretary to impose substantial civil penalties on any person who knowingly violates any provision of the ESA, and entrusts the Secretary with the power to remit or mitigate any such penalty. The Supreme Court knew "of no precedent for applying such a provision against those who administer (as opposed to those who are regulated by) a substantive law," making the argument that it could be used to attack the Secretary's maladministration of the ESA appear highly suspect. *Id.* at 174. Fleshing this argument out, the Court explained that it thought it unlikely that the statute meant to subject the Secretary and his officers and employees to criminal liability under § 1540(b), which makes it a crime for "[a]ny person [to] knowingly violat[e] any provision of [the ESA]," or that § 1540(e)(3), which authorizes law enforcement personnel to "make arrests without a warrant for any violation of

[the ESA]," was intended to authorize warrantless arrest of the Secretary or his delegates for "knowingly" failing to use the best scientific data available. *Id.*

Finally, the Court held that interpreting "violation" in the ESA citizen-suit provision to include "any errors on the part of the Secretary in administering the ESA would effect a wholesale abrogation of the APA's 'final agency action' requirement." *Id.* If it allowed that interpretation, procedural defaults—including those that hadn't resulted in final disposition of the matter at issue—could form the basis of a lawsuit. The Court was "loathe to produce such an extraordinary regime without the clearest statutory direction, which is hardly present here." *Id.* For all of these reasons, the Court held that "[v]iewed in the context of the entire statute, § 1540(g)(1)(A)'s reference to any 'violation' of the ESA cannot be interpreted to include the Secretary's maladministration of the ESA." *Id.* Plaintiffs don't allege that the Secretary committed any act prohibited under § 1538 of the ESA (the "Prohibited Acts" section of the statute). Instead, they allege that FWS "violated" several provisions that govern how FWS implements the ESA. Am. Compl. ¶¶ 67–73, 92–100. That is precisely the sort of "maladministration of the ESA" that the Supreme Court in *Bennett* said was off-limits.

This Court isn't alone in forbidding such claims under the ESA's citizen-suit provision. In *Conservation Force v. Salazar*, plaintiffs filed a nearly identical lawsuit to this one and invoked the ESA's citizen-suit provision to allege that FWS's delay in processing import applications for trophy-hunted Wood Bison violated the ESA. Civ. No. 09-946 (JDB) 753 F. Supp. 2d 29 2010 WL 4870572, *5 (D.D.C. Nov. 30, 2010). After dismissing the action as moot once the permits had been granted, Judge Bates denied plaintiffs' request for attorneys' fees under a "catalyst" theory, finding that "the ESA citizen-suit provision does not authorize judicial review of plaintiffs' permit processing claims" because the plaintiffs couldn't "identify a non-

discretionary, statutory duty under section 1533" that FWS had violated. *Id.* Their claims amounted to nothing more than complaints about the Secretary's maladministration of the ESA and therefore couldn't proceed.

In yet another very similar case, *Conservation Force v. Salazar*, the Northern District of California dismissed a claim brought under the ESA's citizen-suit provision which alleged that FWS's forfeiture of seized sport-hunted leopard trophies "violated" § 1537 of the ESA. 677 F. Supp. 2d 1203, 1211–12 (N.D. Cal. 2009). The Court applied *Bennett* and dismissed plaintiffs' ESA § 1537 claim as failing outside the scope of the ESA citizen-suit provision. *Id.* Specifically, the court found that "Plaintiffs' allegation that defendants failed to cooperate with foreign nations' conservation programs alleges nothing more than maladministration of the ESA. . . . Merely because plaintiffs feel that defendants' actions do not adequately cooperate with other nations' conservation programs does not logically lead to the conclusion that a 'violation' of the ESA has occurred." *Id.* The same reasoning applies here.

Plaintiffs' Second and Sixth Claims fail for an additional reason. Assuming for argument's sake that plaintiffs could challenge the permit denials under the ESA citizen-suit provision in the first place, claims Two and Six would still fail because plaintiffs didn't comply with the requirement in ESA section 11(g)(2)(A)(i) that a plaintiff must submit a written notice of a specific alleged ESA violation at least sixty days prior to filing a complaint. 16 U.S.C. § 1540(g)(2)(C). This notice requirement applies not only to plaintiffs' ESA claims, but also to the allegations in Claims Two and Six that defendants violated CITES, because the ESA is the

domestic implementing legislation for CITES. 16 U.S.C. §§ 1537(a), 1537a, 1540(e)(1), 1540(f); *see also* Am. Compl. ¶ 94.[2]

The notice requirement is a "mandatory condition[ ] precedent to commencing suit" which "a district court may not disregard . . . at its discretion." *Common Sense Recovery v. Evans*, 329 F. Supp. 2d 96, 104 (D.D.C. 2004) (citation omitted); *see also Conservation Force*, 715 F. Supp. 2d at 102–03. Failure to strictly comply with this "preliminary but stringent" jurisdictional requirement "acts as an absolute bar to bringing suit under the ESA." *Research Air, Inc. v. Norton*, Civ. No. 05-623, 2006 WL 508341, at \*10–11 (D.D.C. Mar. 1, 2006) (citations omitted). Dismissal of a defective notice can't be avoided by a "flexible or pragmatic construction" of the notice requirement. *Id.* at \*10 (internal quotation marks and citations omitted). Nor can the failure to comply with this requirement be cured by further amendment of the complaint. *Building Indus. Ass'n v. Lujan*, 785 F. Supp. 1020, 1022 (D.D.C. 1992) (noting that the notice requirement can't be cured "by either a 60-day stay of the case or by applying equitable tolling principles"). Because plaintiffs haven't satisfied this jurisdictional prerequisite, the Court will enter judgment for defendants on Claims Two and Six as well.

Plaintiffs claim for the first time in their reply memorandum that the Court should review claims Two and Six under the APA. Reply Mem. Pls.' Mot. Summ. J. 7–8, Apr. 27, 2011, ECF

---

[2] The Court notes that the same notice requirement would apply if plaintiffs had brought their claims under § 1540(g)(1)(C). Section 1540(g)(2)(C) provides that: "No action may be commenced under subparagraph (1)(C) of this section prior to sixty days after written notice has been given to the Secretary; except that such action may be brought immediately after such notification in the case of an action under this section respecting an emergency posing a significant risk to the well-being of any species of fish or wildlife or plants." Section 1540(g)(2)(A)(i) makes this same notice requirement applicable to actions brought under § 1540(g)(1)(A)—the provision plaintiffs must rely on here.

No. 39. The problem is that analysis of the Amended Complaint makes clear that plaintiffs intentionally chose to raise claims Two and Six under the ESA exclusively and not under the APA. Am. Compl. 19–20, 25–26.

Plaintiffs titled their Second Claim "Violation of ESA Bundle of Duties," and never mentioned the APA in that claim at all. *Id.* at 19–20. Likewise, they titled their Sixth Claim "Violation of CITES and ESA," and never mentioned the APA in that claim either. *Id.* at 25–26. This omission was apparently intentional in light of the fact that several of plaintiffs' other claims specifically include allegations of violations of the APA. Am. Compl. 18–19 (First Claim, titled "Violation of APA"); 21 (Third Claim, titled "Deprivation of Due Process and Violation of the APA"); 21–23 (Claim Four, titled "Arbitrary and Capricious Denial of Applications in Violation of the APA"); 23–25 (Claim Five, titled "Rulemaking"). It would be fundamentally unfair to allow them to raise such a claim for the first time in a reply memorandum because defendants would be denied a sufficient opportunity to respond to that claim.

C.      **The Court grants defendants' cross-motion for summary judgment on Claim Five because in denying plaintiffs' permit applications in this case, the agency didn't engage in a formal rulemaking requiring compliance with the APA's formal rulemaking procedures.**

Plaintiffs allege in Claim Five that, in denying their permit applications, FWS applied certain "requirements or criteria" in such a way as to create a "new policy" or a new rule requiring formal public notice and comment rulemaking under the APA, 5 U.S.C. § 553(b), and publication in the Federal Register pursuant to the Federal Register Act ("FRA"), 44 U.S.C. §§ 1505–07. Am. Compl. ¶ 87–91; Pls.' Mem. at 31–32. According to plaintiffs, the "failure to follow mandatory rulemaking procedures" with respect to these criteria violated the APA and the

FRA. Am. Compl. ¶ 90. Specifically, plaintiffs complain that "[t]here is no regulatory requirement for a national action plan" or "a national population survey" and that the Service should have undertaken formal rulemaking procedures before imposing such requirements. Am. Compl. ¶ 88–89; *see also* Pls.' at 31–32. Plaintiffs also assert that FWS "failed to provide the country of Zambia with notice, an opportunity to comment, and 90 days notice before implementing their new policy as required by the ESA at 16 U.S.C. § 1533 (b)(5)." Am. Compl. ¶ 91; Pls.' Mem. at 36. This claim fails for at least two reasons.

First, there is nothing to indicate that FWS has, either with respect to plaintiffs' import applications or as a general matter, imposed a hard and fast "requirement for a national action plan" or "a national population survey." Am. Compl. ¶¶ 88–89. Those were merely two of many serious concerns FWS had with the elephant protection situation in Zambia, all of which—when considered together—precluded FWS from making the requisite non-detriment and enhancement findings. FWS based its decision on a host of factors that the agency found existed at that time. FWS's decision applied only to this case and it never implied that the factors utilized in this adjudication would or should be used in all permit decisions going forward.

Second, Claim Five fails as a matter of law. This Court has made clear that "[a] permit decision-making proceeding is clearly adjudication rather than rule making." *Nat'l Wildlife Fed'n v. Marsh*, 568 F. Supp. 985, 992 n.12 (D.D.C. 1983). The Court explained in *Marsh* that "[t]he APA defines 'adjudication' as the process of issuing an 'order,' 5 U.S.C. § 551(7), which in turn is defined to include 'licensing,' 5 U.S.C. § 551(6). 'Licensing' is defined to include 'the grant of a license,' 5 U.S.C. § 551(9), which is defined to include an agency 'permit.' 5 U.S.C. § 551(8)." *Id.* Thus, under the plain language of the APA, FWS's decisions on plaintiffs' permit applications fall within the meaning of "adjudication," not a rulemaking. The adjudicatory nature

23

of a permit application is also evident in the applicable regulations. *See, e.g.*, 50 C.F.R. § 13.29 (setting forth procedures for requesting reconsideration of an initial permit denial, which plaintiffs in fact pursued here, and for appealing an "adverse decision" following the submission of a request for reconsideration).

Furthermore, the Supreme Court has endorsed this reasoning, holding that there are two principal characteristics that distinguish adjudications from rulemakings. First, adjudications resolve disputes among specific individuals in specific cases, whereas rulemakings affect the rights of broad classes of unspecified individuals. *United States v. Florida E. Coast Ry. Co.*, 410 U.S. 224, 244–45 (1973). Second, because adjudications involve concrete disputes, they have an immediate effect on the specific individuals involved in the dispute. Rulemaking, by contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently is applied. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216–17 (1988) (the "central distinction" between rulemaking and adjudication is that rules have legal consequences "only for the future") (Scalia, J., concurring).

FWS was presented with a specific set of facts on behalf of a specific group of permit applicants, and it evaluated those facts against the applicable regulatory standards. FWS made no attempt to change existing law or supplement the regulatory requirements. Instead, it simply undertook a straightforward application of the existing regulatory standards set forth at 50 C.F.R. § 23.61 and 50 C.F.R. § 17.40(e)(3)(iii)(C), and made a factual finding that plaintiffs' proposed import wouldn't enhance the survival of the species and also didn't meet CITES non-detriment standard.

Those determinations had immediate, concrete effects on the particular permit applicants, and FWS in no way implied that its decision on plaintiffs' application would bind other

applicants in the future. Thus, the challenged decisions simply aren't rules under the APA. 5 U.S.C. § 551(4) (mandating that an agency rule must be intended to have "future effect"). Because these decisions were adjudications and not rulemakings, plaintiffs' argument that FWS should have engaged in formal rulemaking procedures fails as a matter of law, and the Court will enter judgment for defendants on Claim 5.[3]

### D. The Court will grant defendants' cross-motion for summary judgment on Claim Four as well because the agency acted rationally in denying plaintiffs' permit applications.

Finally, in Claim Four, plaintiffs allege that FWS's denial of their import permit applications was "arbitrary and capricious" because the imports wouldn't be detrimental to the survival of the species, and *would* enhance the survival of the species. Am. Compl. ¶¶ 80–84, 94–98; *see also* Pls.' Mem. at 10–34. Claims Two and Four also allege that the permit denials are contrary to CITES Res. Conf. 2.11 in that FWS should have accepted Zambia's non-detriment finding at face value and not made its own non-detriment analysis. Am. Compl. ¶¶ 70, 95–97; Pls.'s Mem. at 13, 29, 37, 42–45. The facts don't support these claims.

---

[3] In Claims Five and Six in the Amended Complaint—and in no other claims—plaintiffs allege that FWS's decision to decline to make a non-detriment finding in part because Zambia didn't have a national elephant survey violated a stipulation in *Safari Club International, et al. v. Babbitt*, Civ. No. 91-2523 (RCL), 1994 U.S. Dist. LEXIS 18183, *11 (D.D.C. Dec. 15, 1994). This Court has previously held that "[t]he evidence shows that the Service withdrew the *Safari Club* guidelines fifteen years ago and has not used them since." Mem. Op. at 8 (Doc. 30) (citing Van Norman Decl. ¶ 7; 60 Fed. Reg. 12,969). Nothing in plaintiffs' briefing since then changes the Court's opinion on this matter. The fact that there was some overlap between the withdrawn *Safari Club* guidelines and the factors FWS considered in denying plaintiffs' permit applications doesn't mean that FWS reinstituted those guidelines in violation of that stipulation.

FWS's permit decisions are presumed valid, *Environmental Def. Fund v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981), and must be upheld as long as they meet "minimal standards of rationality." *Ehtyl Corp.*, 541 F.2d at 36; *see also American Wildlands v. Kempthorne*, 478 F. Supp. 2d 92, 96 (D.D.C. 2007) (noting that, "[g]iven the expertise of the [Service] in the area of wildlife conservation and management and the deferential standard of review, the Court begins with a strong presumption in favor of upholding decisions of the [Service].") (citation omitted). FWS's permit decisions easily meet minimal standards of rationality.

The administrative record demonstrates that FWS considered the relevant statutory and regulatory factors and provided a rational explanation of its findings with respect to each factor. FWS's ultimate conclusion—that plaintiffs failed to make the requisite showings that: (1) plaintiffs' import of elephants from Zambia is for purposes not detrimental to the survival of the species; and (2) plaintiffs' killing of the elephants would enhance the survival of the species—is well-supported by the record, rationally explained, and due deference.

To grant a CITES import permit application for an Appendix I species, FWS must first determine that "a proposed import of an Appendix-I specimen is for purposes that would not be detrimental to the survival of the species." 50 C.F.R. § 23.61(a). To determine whether an activity is "detrimental," FWS considers whether the use is "unsustainable," "would pose a net harm to the status of the species in the wild," would cause "interference with recovery efforts for a species," or would result in "stimulation of further trade." *Id.* § 23.61(b), (e). It's the applicant's burden to provide sufficient information for FWS to make a finding of "non-detriment." *Id.* § 23.61(c).

In making that non-detriment finding, FWS considers whether the removal of the animal from the wild: "is part of a biologically based sustainable-use management plan that is designed

to eliminate over-utilization of the species"; "would not contribute to the overutilization of the species, considering both domestic and international uses"; and "would not lead to long-term declines that would place the viability of the affected population in question." *Id.* Importantly, "[i]n cases where insufficient information is available or the factors [in 50 C.F.R. § 23.61] are not satisfactorily addressed, we take precautionary measures and would be unable to make the required finding of non-detriment." *Id.* § 23.61(f)(4). After applying these regulatory standards to the evidence in the record, FWS decided not to render a non-detriment finding on plaintiffs' permit applications. The Court proceeds to review FWS's reasons for its decisions.

The record demonstrates that Zambia's wildlife agency was in total disarray and thus unable to either provide reliable elephant data or ensure that sport hunting wouldn't result in the stimulation of further trade in ivory. As discussed above, the independent CITES Panel traveled to Zambia in 2002 and found that:

- The Zambian wildlife agency ("ZAWA") was plagued with "much political interference." AR 82.

- "[F]or a period of almost 10 months in 2000, there was virtually no law enforcement in the majority of Zambia's conservation areas. The result was that illegal hunters killed relatively large numbers of elephants. To illustrate this, during the above 10-month transition period, it was estimated that 156 elephants were killed in an area about 2,560 [square] km in the central Kafue alone." *Id.*

- "[M]ost conservation areas in the Kafue Region were losing wildlife at an unsustainable rate" due to a "wave of illegal activity." AR 83.

- "[T]he fact that the overall population is not increasing (and could be decreasing) suggests that there is an important illegal offtake that accounts for a substantial amount of the ivory that could in theory be produced from an elephant population of this size. The Panel estimates that this accounts for up to some 800 animals a year. In view of these factors, it must be concluded that the overall level of offtake is not sustainable." AR 84.

- "Since . . . 1998, Zambia's own capability to monitor its elephant population has been virtually non-existent." *Id.*

- "The current situation suggests that there has been a drastic decline in the effectiveness of the antipoaching activities. This appears to be mainly the result of a severe depletion of operational funding. . . . The insufficient and erratic supply of operational funds and logistical support has greatly affected the performance of staff. The consequence of these actions has been a substantial increase in the level of poaching of all species." AR 85.

- With respect to ivory seized from poachers, Zambia's ivory stockpile was "susceptible to fraud" due to improper storage, inadequate organization, and many tusks unaccounted for. AR 86.

- Several ZAWA staff members had been arrested for illegal elephant trade. AR 88.

FWS relied in part on these findings in declining to make a non-detriment finding. AR 319.

Neither Zambia nor the plaintiffs provided any evidence to show that ZAWA's situation had improved by the time plaintiffs shot elephants in 2005 and 2006. Rather, the record shows that, as of 2004, "ZAWA was misusing trophy and permit fees instead of distributing them to the communities where the hunting took place." AR 184. This abuse of permit fees caused the European Union to cease its funding of ZAWA. *Id.* These problems continued until at least November of 2006 when, in response to an inquiry from FWS, a local scientist in Zambia relayed that he was

> Aware of numerous stories, all quite true, of internal corruption by field officers, including licensing offices and the abuse by licensed hunters. It is fair to say I have learned of these facts from senior ZAWA staff, particularly the Director General, himself, who has an enormous challenge cleaning up the institution. . . . his team is generally weak and he will face enormous difficulties. I cannot over-emphasize how bad it is.

AR 450; *see also* AR 450–54.

ZAWA also continued to have difficulty funding its operations in 2005 and 2006. After trying to clarify the issue with Zambian officials, FWS "continue[d] to question whether Zambia has sufficient financial resources for elephant conservation activities, including law enforcement activities, including law enforcement and management." AR 713. Based on this and other record

28

evidence, it was rational for FWS to conclude that Zambia lacked a stable government presence for elephant management and protection, including any "effective" "anti-poaching measures" or even basic operational funding. AR 319; *see also* AR 708–16.

FWS also considered whether the trophy hunting at issue "is part of a biologically based sustainable-use management plan that is designed to eliminate over-utilization of the species." 50 C.F.R. § 23.61(c)(2). Although ZAWA submitted an undated draft "National Policy and Action Plan on Elephant Management in Zambia," AR 924–51, FWS determined that this was merely the product of a "workshop" rather than "an official document" of the government of Zambia, and that it was "unclear whether the action plan carries the weight of law or provides voluntary guidelines." AR 318–19.

FWS also found that the terms of the plan, even if ratified, "are very broad. No information is provided about which organizations will carry out these items, the steps already taken to accomplish the objectives . . . , the time frame for accomplishing each action item, and who will be responsible for monitoring compliance with the plan." AR 319. For that reason, FWS concluded that Zambia lacked a ratified government elephant management plan that "carries the weight of law" and outlines sufficiently specific information about how it will actually be implemented. AR 319; AR 712.

Plaintiffs respond that the evidence shows that the management plan is binding because "[t]he hunting itself is implementation of the Plan." Pls.' Mem. at 30. Beyond being question-begging, this argument finds no support in the record. Simply because people travel to a range country to engage in trophy hunting doesn't mean that the government of that country is implementing a sustainable elephant management program.

In its decision whether to issue a non-detriment finding under 50 U.S.C. § 23.61, FWS also considers whether the trophy hunting at issue is "unsustainable," "would pose a net harm to the status of the species in the wild," would cause "interference with recovery efforts for a species," "would not contribute to the over-utilization of the species, considering both domestic and international uses," and "would not lead to long-term declines that would place the viability of the affected population in question." 50 C.F.R. § 23.61(b), (c), (e). FWS was unable to make those findings here due to the absence of any reliable data about the proportion of elephants killed by poachers in Zambia. AR 319; AR 713–15; AR 719 (explaining that "[t]he status of elephant populations in Zambia must be determined, though scientific based research and reliable population surveys, before the Service could recognize that the [proposed] level of off-take was appropriate").

More specifically, "[b]ecause quantitative data are not available on the levels of poaching throughout Zambia, [FWS] cannot evaluate the total level of off-take (i.e., poaching, control, and harvest) from the population." AR 713. In other words, without data on the other sources of "off-take," FWS claimed that it couldn't determine whether additional lethal take from sport hunting "would not contribute to the over-utilization of the species, considering both domestic and international uses," and "would not lead to long-term declines that would place the viability of the affected population in question." 50 C.F.R. § 23.61(b), (c), (e). If poaching cannot be controlled, sport hunting could be "unsustainable" and "pose [a] net harm to the status of the species in the wild." *Id.*; AR 314 (quoting a local scientist who observed that "the population of large, trophy males is very small, and declining. The number of these large males, the only animals hunters are interested in, was severely reduced in the 60s and 70s and even now by

poachers. There are very few left, and their gene pool is of extreme importance to elephants in the future").

Plaintiffs complain that FWS's "actual population numbers" requirement was unlawful. Pls.' Mem. at 22. This argument falls short. FWS didn't impose a hard and fast population count as a prerequisite for granting plaintiffs' permit applications. Instead, this was one of many concerns that led to the denial of the permit applications. But even if Zambia had an accurate population count or estimate for its elephant population, FWS would still be unable to determine that sport hunting is sustainable without also knowing the impact on that population of other sources of "off-take." FWS was concerned about was that "quantitative data are not available on the levels of poaching throughout Zambia." AR 713; *see also id.* (citing the CITES Panel report findings that "there are no reliable data indicating the number of elephants killed each year through control or illegal activities"). As explained above, "[i]n cases where insufficient information is available or the factors are not satisfactorily addressed, we take precautionary measures and would be unable to make the required finding of non-detriment." *Id.* § 23.61(f)(4). Without sufficient data on poaching, it was reasonable for FWS to decline the non-detriment finding in this case.

Plaintiffs also argue that "the ESA was amended in 1982 to state that population estimates . . . are not required for CITES non-detriment determinations," and that the D.C. Circuit has gone a step further and affirmatively held that "population estimates were no longer a valid requirement for non-detriment determinations." Pls.' Mem. at 27–28 (citing 16 U.S.C. § 1537a(c)(2); *Defenders of Wildlife v. Endangered Species Scientific Auth.*, 725 F.2d 726 (D.C. Cir. 1984)). Plaintiffs are mistaken on both counts. The fact that FWS "is not *required* to make . . . estimates of population size" under the ESA doesn't mean that it may not do so in a particular

situation. 16 U.S.C. § 1537a(c)(2) (emphasis added). Nor did the D.C. Circuit find that FWS couldn't use population estimates. In the case plaintiffs cite, the D.C. Circuit merely recognized that the ESA preserved "the discretion of the Secretary" in electing whether to consider population estimates and acknowledged that such population data is no longer a mandatory requirement. *Defenders of Wildlife*, 725 F.2d at 731. FWS didn't require a population count or estimate as a precondition to a permit issuing. Instead, the lack of population data along with several other factors worked in concert to convince the agency that it should deny plaintiffs' permit applications.

To review, uncontroverted evidence in the record shows that: (1) there was no indication of a reliable funding stream to support elephant management and protection measures by the Zambian government; (2) the draft proposed Zambian management plan hadn't been ratified or given the force of law; (3) reliable poaching and off-take data wasn't available; (4) Zambia lacked measurably effective anti-poaching measures; and (5) there was evidence that Zambia's wildlife law enforcement agency had corruption problems and other serious operational difficulties. FWS provided a detailed explanation of its findings on each point and explained how it could not issue a non-detriment finding in light of these grave problems. AR 317–20, 708–21. Based on the totality of the circumstances, it was rational for FWS to decline to make a non-detriment finding under 50 C.F.R. § 23.61.

Plaintiffs also argue that CITES Res. Conf. 2.11 required FWS to show greater deference to Zambia's non-detriment export finding for FWS's. Pls.' Mem. at 29 (asserting that "[d]efendants should defer to Zambia's judgment on that matter"); *id.* at 42–43. Under plaintiffs' reading of CITES Res. Conf. 2.11, the importing country must defer almost completely to the exporting country's non-detriment determination. *Id.* This is a misreading of CITES Res. Conf.

2.11. Although the Parties to CITES have resolved that "the Scientific Authority of the importing country" should "accept the finding of the Scientific Authority of the exporting country that the exportation of the hunting trophy is not detrimental to the survival of the species" under paragraph 2(a) of Article III of CITES, it need not do so where, as here, "there are scientific or management data to indicate otherwise." CITES Res. Conf. 2.11(b).

CITES Res. Conf. 2.11 also makes clear that "the scientific examination by the importing country in accordance with paragraph 3(a) of Article III" must "be carried out independently of the result of the scientific assessment by the exporting country in accordance with paragraph 2(a) of Article III, and vice versa." CITES Res. Conf. 2.11(c). CITES' text and structure also make this clear. Section 2(a) of Article III requires the exporting country to make a determination "that such export will not be detrimental to the survival of that species," while Section 3(a) of Article III requires a separate determination by the import country "that the import will be for purposes which are not detrimental to the survival of the species involved." CITES art. III. Thus, federal regulations require FWS to make an independent non-detriment finding prior to granting an import permit, and plaintiffs' argument that FWS failed to give proper deference to Zambia's non-detriment determination is unpersuasive. 50 C.F.R. § 23.61.

In addition to the non-detriment finding required above for all CITES Appendix I species, when an applicant applies to import a sport-hunted elephant trophy, FWS, through DMA, must also make an addition "determination . . . that the killing of the animal whose trophy is intended for import would enhance [the] survival of the species." 50 C.F.R. § 17.40(e)(3)(iii)(C). To meet this requirement,

> the importation must be associated with activities that provide a direct benefit to
> the species being hunted. Such benefits could include the use of revenue
> generated by the hunt to support conservation projects or to manage the species.

> Other benefits that could result from activities that enhance the survival of the species include improving human-wildlife conflicts, anti-poaching efforts, or habitat conservation.

AR 717.

Applying that standard here, the DMA found that as a general matter, "sport-hunting could have a positive effect on the conservation of elephants when a sound management plan is in place," but that Zambia had no such management plan. AR 720; *see also* AR 712 (DSA noting that "we still do not know whether" Zambia's draft elephant management plan "is mandatory or voluntary"). After reviewing all available information, including all materials submitted by Zambia, DMA concluded

> [w]e received nothing to substantiate that a specific elephant management plan was developed and in place in 2005 to address management issues for Zambian elephants. Although sport-hunting of elephants in Zambia was re-opened [by Zambian authorities] in May 2005, there appeared to be little scientific basis to support such an action and no management program in place to ensure that any level of take would be sustainable.

AR 718. More specifically, although ZAWA reported $298,000 in income from elephant sport-hunting permits between 2005 and 2007,

> There was no indication given as to how this revenue was utilized to further elephant conservation and management programs within Zambia. This puts into question whether the revenue ZAWA collected from elephant sport-hunting during this timeframe in any way furthered Zambia's efforts to establish a sustainable management program for elephants.

AR 720 ; *see also* AR 184 (observing that "ZAWA was misusing trophy and permit fees instead of distributing them to the communities where the hunting took place"); *id.* (noting that this abuse of permit fees caused the European Union to cease its funding support for ZAWA). In response, plaintiffs point to various parts of the record to support their general argument that sport-hunting helps elephant populations because trophy hunting fees are used by local

governments to combat poaching and to compensate local landowners whose property has been destroyed by elephants. The problem is that FWS considered those arguments and materials and deemed them deficient. Plaintiffs' frustrations are understandable—no one in their position would be satisfied with a permit denial—but those frustrations simply aren't enough to prove that FWS's decision was arbitrary and capricious.

Plaintiffs also complain that FWS didn't consider much of the evidence that the individual plaintiffs submitted with their permit applications. Their evidence, however, simply wasn't enough to overcome the many serious problems with their applications the agency identified. The fact that one sport hunter may have seen what he believed to be "plenty of elephant"—for instance—doesn't show that sport hunting isn't detrimental to the Zambian elephant population as a whole. Moreover, the fact that plaintiffs were told that their trophy hunting fees would be used for conservation purposes doesn't prove that the fees were in fact used for that purpose.

Instead, the record makes clear that Zambian authorities provided no evidence that such "revenue was utilized to further elephant conservation and management programs in Zambia." AR 720. Since the record demonstrates that Zambia had no program in place during 2005 and 2006 to ensure that trophy fees would in fact go toward the enhancement of the species as a whole, FWS's decision on plaintiffs' permit applications must be upheld.

The Court notes that plaintiffs also raise a facial challenge to the validity of this "enhancement" regulation. The Court has no need to wade out to meet that argument, however, because even if plaintiffs' were right—and this Court doubts very seriously that they are—their claims would still fail because the agency's rational decision not to make the necessary non-detriment finding is enough on its own to justify the permit denials in this case.

**IV.    Conclusion**

For the reasons discussed above, the Court will deny plaintiffs' motion for summary

judgment and grant defendants' cross-motion for summary judgment. A separate order

memorializing these conclusions will issue this day.


Date: August 30, 2011                                   _____/s/_____
                                                         Royce C. Lamberth
                                                         Chief United States District Judge